# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Natividad Silva,

    Petitioner,

v.

David Paul, Warden,

    Respondent.

Case No. 18-cv-02177 (ECT/ECW)

**REPORT AND RECOMMENDATION**

Petitioner Natividad Silva ("Silva"), a prisoner at the Federal Medical Center in Rochester, Minnesota ("FMC-Rochester"), has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241. (Dkt. No. 1.) Petitioner has also filed a Motion for a Temporary Restraining Order and Preliminary Injunction and Request or Emergency Hearing ("TRO Motion"). (Dkt. No. 17.) This case has been referred to the undersigned United States Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For the reasons discussed below, the Court recommends that the Petition for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241 (Dkt. No. 1) and the TRO Motion (Dkt. No. 17) be denied.

## I. FACTUAL BACKGROUND

**A.  Silva's Incarceration at FMC-Rochester**

Silva is presently incarcerated at FMC-Rochester. (Dkt. No. 15 ¶ 5; Dkt. No. 15-2.) He is serving a 397-month term of imprisonment for Robbery Affecting Commerce and Aiding and Abetting, in violation of 18 U.S.C. § 1951(a), and Possession of a

1

Firearm During a Crime of Violence, in violation of 18 U.S.C. § 924(c)(1)-(2).  (*Id.*)  His present projected date of release is May 6, 2021, via a good conduct time release.  (*Id.*)

**B.     Silva's Employment in FMC-Rochester's HVAC Trade Program**

Gerald Drazkowski ("Drazkowski") serves as a heating, ventilation, and air conditioning ("HVAC") foreman for FMC-Rochester.  (Dkt. No. 15 ¶ 1.)  As the HVAC foreman, Drazkowski is responsible for completing HVAC repairs and maintenance; teaching inmates the trade of HVAC following the Department of Labor Apprenticeship Program; and maintaining the security of FMC-Rochester by verifying inmate accountability and maintaining tool control.  (*Id.* ¶ 2.)  Drazkowski hired Silva to participate in the HVAC apprenticeship program on November 7, 2016.  (Dkt. No. 15 ¶ 7; Dkt. No. 15-1.)

Silva's work performance rating for the month of November 2016 shows that Drazkowski rated Silva as a 2 out of 5 (with 5 being the best), or "fair," on each category of the evaluation, including the quality and quantity of his work; his initiative, eagerness and ability to learn; need for, and response to, supervision; ability to work with others; and overall job proficiency.  (Dkt. No. 15 ¶ 8; Dkt. No. 15-3.)

Drazkowski asserts Silva failed to report to his work assignment for the afternoon work call on December 21, 2016.  (Dkt. No. 15 ¶ 9.)  Drazkowski was accountable to the Bureau of Prisons ("BOP") for Silva's whereabouts and had repeatedly reminded Silva that he needed to show up to work.  (*Id.*)

Drazkowski also claims that on December 28, 2016, Silva instructed inmate A.S. to come to the HVAC shop and ask Drazkowski for a job.  (*Id.* ¶ 10.)  Drazkowski was

2

unable to hire A.S. because Drazkowski had just hired another inmate, D.W., and consequently there were no openings on his work detail. (*Id.*) Drazkowski maintains Silva was upset that Drazkowski did not hire A.S. and told Drazkowski that he had messed up, that he had made a bad choice, was wrong, and was bad at hiring. (*Id.*) Drazkowski told Silva that he was out of line and that hiring determinations were his decision. (*Id.*)

According to Drazkowski, on December 30, 2016, Silva refused to work with his work group on an air handler issue in the FMC-Rochester mechanical room. (*Id.* ¶ 11.) Drazkowski asked Silva to help, and Silva responded, "I know how to do this, and they're in the way." (*Id.*) Drazkowski told Silva that he should help, but Silva responded, "They're just doing it wrong; I could do it and not get dirty." (*Id.*) Drazkowski again told Silva that he needed to pick up tools and help the group with the work. (*Id.*) Silva then told Drazkowski, "I won't work in groups." (*Id.*) Drazkowski claims that when he pulled Silva into his office to discuss the incident, he explained to Silva that the majority of HVAC learning opportunities were in a group form, but Silva refused to help in a group setting. (*Id.*) Silva then proceeded to again criticize Drazkowski for not hiring A.S. and used a BOP staff member's name to intimidate Drazkowski. (*Id.*) According to Drazkowski, Silva had completely alienated himself from the group, and the other HVAC inmates were refusing to work with him. (*Id.*)

Silva's work performance rating for the month of December 2016 indicates Drazkowski again rated Silva as a 2, or "fair," on each category of the evaluation sheet, with the exception of "initiative." (*Id.* ¶ 12; Dkt. No. 15-4.) For the "initiative" section,

Drazkowski rated him as a 1, or "unsatisfactory," which states in pertinent part "always waits to be told what to do and needs help getting started." (Dkt. No. 15-4.)

On January 3, 2017, Silva sent an email to Warden LaRiva complaining that Drazkowski continuously yelled at him, including yelling at him for recommending another employee inmate for the HVAC program. (Dkt. No. 1-1 at 3.) Silva also asserted that he got in trouble when other "inmates got into a disagreement as to how to remove a bolt—I took two-steps back and got yelled at when the inmates made jokes at me for not being dirty." (*Id.*) Silva asserted that he did not want to be fired from the program and did not know why Drazkowski continued to threaten and yell at him in front of other intimates. (*Id.*) Silva asked Warden LaRiva to intervene prior to him having to file for remedies. (*Id.*)

On January 4, 2017, Drazkowski had discussion with Silva about constantly challenging his authority. (Dkt. No. 15 ¶ 13.) Drazkowski asserts that Silva was very argumentative during this discussion and accused Drazkowski of yelling at him daily, which Drazkowski denies doing. (*Id.*) According to Drazkowski, Silva refused to accept any responsibility for his actions, and Drazkowski was left with no choice but to fire him for his work call absence, refusing to perform work in a group, and insolence to staff. (*Id.*) Drazkowski denies firing Silva for his use of the administrative remedy process or for complaints Silva filed about his job or Drazkowski. (*Id.* ¶ 14.)

Silva sent another email on January 4, 2017 to Warden LaRiva asserting that he had been terminated from the HVAC program by Drazkowski because he claimed Silva dictated the way Drazkowski ran the shop, that Silva did not wish to work and

"something about filing with congressionmenand [sic] sentors." (Dkt. No. 1-1 at 4.) Warden LaRiva responded to Silva on January 5, 2017, letting him know that the matter would be investigated. (*Id.*)

Silva refutes the claims made by Drazkowski in his Declaration. (Dkt. No. 25 ¶ 4.) According to Silva, the assertion in the declaration must be false because D.W. had left FMC-Rochester and A.S. was disliked by staff. (*Id.*)

**C.     Silva's Application to the Teaching Animals & Inmates Life Skills Program**

FMC-Rochester has partnered with Can Do Canines, a nonprofit organization which provides assistance dogs to people with disabilities, to create the Teaching Animals & Inmates Life Skills ("TAILS"). (Dkt. No. 22 ¶ 3.) In this program, inmates raise and train the puppies until the puppies are about 18 months old, when Can Do Canines then takes over and provides specialized training. (*Id.*) For this program, two inmate handlers would be assigned to each puppy, and observers would also be selected who would become a handler if an assigned handler had to leave the program. (*Id.*)

FMC-Rochester staff select the inmate handlers. (*Id.*) The TAILS program coordinators received 32 applicants for 14 handler and 2 observer positions. (*Id.* ¶ 4.) In selecting handlers, coordinators considered factors such as whether the inmate was appropriate to be around animals, was capable of completing the training associated with the program, could partner well with another handler and follow the instructions of Can Do Canines, and other correctional management concerns. (*Id.*) They solicited input from various departments throughout the facility. (*Id.*) The coordinators interviewed 23 of the 32 applicants and selected 16 inmates for the program. (*Id.*)

Silva applied to be a handler in the TAILS program.  (*Id.* ¶ 5; Dkt. No. 19.)  In reviewing his application, the BOP program coordinators noted he had difficulty maintaining relationships with his peers and staff.  (Dkt. No. 22 ¶ 5.)  The coordinators concluded Silva might not be a good match for the TAILS program at that time because the inmate handlers needed to work together to train a puppy and be receptive to feedback from Can Do Canines trainers.  (*Id.*)  However, the TAILS program is expected to expand, and Silva can reapply for one of these future handler positions.  (*Id.*)

According to Silva, the only requirement of the TAILS program is that he be incident free for the last 12 months and have at least 18 months left on his sentence.  (Dkt. No. 19.)  Silva maintains that this program is the "last and final opportunity in his attempt for any form of an 'occupational training' needed upon release. . . ."  (*Id.*)  During his incarceration, Silva has had a number of work assignments including, but not limited to, food service, electrical, vehicular component repair, computer repair and orderly.  (Dkt. No. 15-1.)  He is presently participating in several programs, including as a volunteer therapist helping inmates regain mobility and volunteering with hospice care.  (Dkt. No. 19; Dkt. No. 24 at 10-11.)

## II.   ANALYSIS—2241 PETITION

In this Petition, Silva challenges the following: (1) the BOP's interpretation of 18 U.S.C. § 3621(b), the Second Chance Act, and the Federal Prisoner Re-Entry Initiative is in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 500 *et seq.*, for "failure of notice and comments;" (2) the BOP's alleged failure to set forth in the administrative record the rational basis upon which it relied in promulgating an

6

unspecified rule; and (3) the "BOP's failure to articulate a 'Rationale' for its exclusionary rule rendering § 3621(b), Second Chance Act, and the Federal Prisoner Re-Entry [ ] Initiative-arbitrary, capricious in violation of § 706(2)(A) of the APA." (Dkt. No. 1 ¶ 9; Dkt. No. 2 at 7.)

In his memoranda supporting his Petition and his TRO Motion, Silva claims the BOP violated the APA because it failed to follow proscribed "notice and comment" procedures before promulgating substantive rules under 18 U.S.C. § 3621; the Second Chance Act ("SCA") 18 U.S.C. § 3624; and the Federal Prisoner Re-Entry Initiative ("FPRI"), 34 U.S.C. § 60541. (Dkt. No. 2 at 4, 13-16; Dkt. No. 18 at 1, 3-4; Dkt. No. 19.) In addition, Silva argues the BOP failed to establish an administrative record in articulating a rational basis for its decisions under the FPRI because the BOP failed to promulgate regulations associated with SCA in compliance with procedures under § 553 of the APA. (*Id.*) Silva asserts that the BOP's decision related to the FPRI is arbitrary and capricious because he has been denied occupational training due to his filing complaints against staff, a factor that the BOP cannot consider, and has failed to provide a record explaining its decision. (Dkt. No. 2 at 17-19.) The relief sought by Silva is a reduction in his sentence or his immediate release as the result of the APA violation. (*Id.* at 19.)

Enacted as part of the Second Chance Act, 34 U.S.C. § 60541 (formerly 42 U.S.C. § 17541) directs the BOP to implement personal, educational, and vocational programs:

> The Attorney General, in coordination with the Director of the Bureau of Prisons, shall, subject to the availability of appropriations, conduct the following activities to establish a Federal prisoner reentry initiative:

7

> (1) The establishment of a Federal prisoner reentry strategy to help prepare prisoners for release and successful reintegration into the community, including, at a minimum, that the Bureau of Prisons--
>
> (A) assess each prisoner's skill level (including academic, vocational, health, cognitive, interpersonal, daily living, and related reentry skills) at the beginning of the term of imprisonment of that prisoner to identify any areas in need of improvement prior to reentry;
>
> (B) generate a skills development plan for each prisoner to monitor skills enhancement and reentry readiness throughout incarceration;
>
> (C) determine program assignments for prisoners based on the areas of need identified through the assessment described in subparagraph (A);
>
> (D) ensure that priority is given to the reentry needs of high-risk populations, such as sex offenders, career criminals, and prisoners with mental health problems; . . .

34 U.S.C. § 60541(a)(1).

According to Silva the "re-entry initiative" in § 60541 "requires the BOP to establish a re-entry strategy in order to prepare him for release" and that the FPRI directs the BOP to implement personal educational and vocational programs as part of this strategy and to give high-risk inmates, such as himself, priority.  (Dkt. No. 2 at 4.)  Silva argues that "he finds himself unable to partake in any apprenticeship programs due to his exhausting 'the grievance procedure'" and that the BOP is thereby violating the APA for failing to follow the "notice and comment procedures."  (*Id.* at 15-16.)  While Silva asserts in conclusory fashion that his § 2241 Petition challenges the fact or duration of his confinement (*id*. at 7), Silva's Petition and his TRO Motion focus on his claims that he has been denied occupational training because he has filed complaints against BOP officials.  (*Id.* at 3, 14-19; Dkt. No. 18 at 2-3.)

Silva also challenges his transfers from various places of incarceration, including MCF-Seagoville, MCF-Sandstone and MCF-Oxford, without consideration of the factors under § 3621(b).[1] (Dkt. No. 24 at 8.) According to Silva, the transfers occurred solely due to the fact he has filed grievances against BOP employees. (*Id.*) While Silva

---

[1] Section 3621(b) provides in relevant part:

Place of imprisonment.--The Bureau of Prisons shall designate the place of the prisoner's imprisonment. The Bureau may designate any available penal or correctional facility that meets minimum standards of health and habitability established by the Bureau, whether maintained by the Federal Government or otherwise and whether within or without the judicial district in which the person was convicted, that the Bureau determines to be appropriate and suitable, considering--

(1) the resources of the facility contemplated;

(2) the nature and circumstances of the offense;

(3) the history and characteristics of the prisoner;

(4) any statement by the court that imposed the sentence--

(A) concerning the purposes for which the sentence to imprisonment was determined to be warranted; or

(B) recommending a type of penal or correctional facility as appropriate; and

(5) any pertinent policy statement issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28.

In designating the place of imprisonment or making transfers under this subsection, there shall be no favoritism given to prisoners of high social or economic status. The Bureau may at any time, having regard for the same matters, direct the transfer of a prisoner from one penal or correctional facility to another.

18 U.S.C. § 3621(b).

acknowledges that he does not have any constitutional right to a place of incarceration and the APA would bar review of the BOP's discretionary decisions, Silva nevertheless asserts his Petition properly challenges the BOP's improper deviation from its statutory authority under the factors listed in § 3621(b) and failure to establish an administrative record for its decision making. (*Id.*)

Respondent argues that the Silva's claims do not sound in habeas because his complaints regarding vocational programs and transfers deal with the conditions of confinement, as opposed to the fact or duration of confinement. (Dkt. No. 13 at 11-12.) This Court agrees. Claims under 28 U.S.C. § 2241 are improper if they challenge the conditions of the prisoner's confinement and not the fact or duration of the confinement. *See Heck v. Humphrey*, 512 U.S. 477, 481 (1994). As the Eighth Circuit has held, "'[i]f the prisoner is not challenging the validity of his conviction or the length of his detention, such as loss of good time, then a writ of habeas corpus is not the proper remedy." *Spencer v. Haynes*, 774 F.3d 467, 469 (8th Cir. 2014) (alteration in original) (quoting *Kruger v. Erickson*, 77 F.3d 1071, 1073 (8th Cir. 1996) (per curiam), citing *Preiser v. Rodriguez*, 411 U.S. 475, 499 (1973)).

Silva's claims are premised on his belief that the BOP's actions are depriving him of his rights under § 60541 to be prepared upon his release from prison by not allowing to him to participate in various vocational programs. Such an assertion deals with the conditions of his confinement, i.e., the alleged inability to participate in programs while in prison, and does not bear on his continued detention. *See Phuong Dong Duong v. Martin*, No. 3:13CV1082 DPJ-FKB, 2014 WL 1665012, at *2 (S.D. Miss. Apr. 25, 2014)

10

(citations omitted) ("Participation in an educational or vocational program would have no effect on Duong's release date; nor does this claim concern in any way the validity or the execution of his sentence. Thus, it is not appropriate for relief under 2241, which provides a remedy for challenging the fact or duration of confinement, not prison conditions or procedures.").

Similarly, Silva's claim regarding the improper transfers under § 3621 deals with his transfers between detention facilities and not release from detention. The Eighth Circuit has cited with approval a Fifth Circuit case for the proposition that complaints related to transfers "could not be brought under a habeas petition because '[h]abeas corpus is not available to prisoners complaining only of mistreatment' and '[t]he relief from [the petitioner's injury], [i]f proved, is in the form of equitably-imposed restraint, not freedom from otherwise lawful incarceration.'" *Spencer*, 774 F.3d at 471 (quoting *Cook v. Hanberry*, 592 F.2d 248, 248 (5th Cir. 1979) (per curiam)) (alterations in original).

In his reply to the Respondent's brief, Silva argues that his Petition does not challenge the prison conditions, but rather:

> [C]hallenges the manner in which the BOP executes Silva's sentence… acting 'arbitrary, capricious, and abuses its discretion' as it continues to deny consideration of factors mandated by Congress…that implicates the fact of duration of confinement. The BOP is required to consider proper factors under 3621(b), striving to afford Silva 'a reasonable opportunity to adjust to amd [sic] prepare for the re-entry back into the community under § 3624(c).

\* \* \*

11

> Silva seeks review and a reduction of sentence or immediate release as a relief under the BOP statutes regarding placement and early release . . . which relates to the fact or duration of his sentence/confinement. . . .

(Dkt. No. 24 at 1-2.)

Silva cites to several cases where he asserts courts have considered placement and transfer determinations pursuant to § 3621(b) and § 3624(c) under § 2241. (*Id.* at 2 (citing *Miller v Whitehead*, 527 F.3d 752, 758 (8th Cir. 2007); *Fult v. Sanders*, 442 F.3d 1088, 1090 (8th Cir. 2006); *Woodall v. Fed. Bureau of Prisons*, 432 F.3d 285 [sic] (3d Cir. 2005); *Brown v. Warden Fairton, FCI*, 617 F. App'x 117, 118 (3d Cir. 2015).) However, these cases all dealt with determining whether the BOP criteria for placement of an inmate into a halfway house (otherwise referred to as a Residential Re-Entry Center ("RRC") or a community corrections center ("CCC")) violated § 3621(b). In *Woodall*, *supra*, relied upon by Silva, the court concluded that confinement in a traditional federal prison is "qualitatively different" from community confinement, and thus justifies utilization of § 2241 for challenging BOP regulations regarding placement in a CCC. 432 F.3d at 243. Other courts, including courts within this District, have concluded that questions of RRC placement pertaining to § 3621(b) implicate the fact or duration of confinement because the difference between a prison and a halfway house represents "a quantum change in the level of custody." *See*, *e.g.*, *Bania v. Roal*, No. 11-cv-925 (SRN/TNL), 2011 WL 7945547, at *3 (D. Minn. Oct. 24, 2011), *R. & R. adopted by* 2012 WL 1886485 (D. Minn. May 23, 2012) (citation omitted) ("RRC placement decisions implicate the fact or duration of confinement."); *Dale v. Ziegler*, No. 5:10CV87, 2011 WL 1297071, at *4 (N.D.W. Va. Jan. 18, 2011), *R. & R. adopted by* 2011 WL 1297051

12

(N.D.W. Va. Apr. 5, 2011) ("The question is whether the prisoner is seeking a 'quantum change in the level of custody' which must be addressed by habeas corpus, or 'a different program or location or environment,' which raises a civil rights claim. *Graham v. Broglin*, 922 F.2d 379, 381 (7th Cir. 1991); *see also Glaus v. Anderson*, 408 F.3d 382, 387-88 (7th Cir. 2005). Clearly, the difference between a prison and a halfway house represents a "quantum change in the level of custody" under *Graham* because the two forms of custody are qualitatively different.[2] *Hendershot v. Sciabana*, 04-C-291-C, 2004 WL 1354371 (W.D. Wis. June 10, 2004).").

In view of Silva's allegations, the only possible rationale for his Petition being grounded in § 2241 are passing (and somewhat confusing) statements appearing to argue that Respondent's actions implicate 18 U.S.C. § 3621, which, in turn, raises the prospect of reduction of sentence, a larger reduction in sentence, or immediate release as a relief under the BOP statutes regarding placement and early release. (Dkt. No. 18 at 3; Dkt.

---

[2]  The Court notes that it appears that the level and amount of RRC placement ("1/2-way house") Silva will receive has not been finalized. (Dkt. No. 18 at 2-3; Dkt. No. 24 at 9-10.) Silva is not challenging RRC placement as part of his Petition. Indeed, any challenge regarding RRC placement would be premature. *See United States v. Acosta-Cruz*, No. 11-cr-0024 (SRN/FLN), 2018 WL 5801900, at *2 (D. Minn. Nov. 6, 2018) (citing *Pub. Water Supply Dist. No. 10 of Cass Cty., Mo. v. City of Peculiar, Mo.*, 345 F.3d 570, 573 (8th Cir. 2003)) ("Here, Acosta-Cruz's claim is not ripe for judicial review. Because Acosta-Cruz has not been reviewed for pre-release RRC placement yet, his petition is premature. Acosta-Cruz's petition is not ripe because it is both 'contingent on future possibilities' and the injury is not 'certainly impending.' Instead, Acosta-Cruz's injury is merely speculative at this juncture."); *see also Leventhal v. Warden Rios*, No. 17-cv-05441 (PAM/KMM), 2018 WL 3130682, at *4 (D. Minn. May 16, 2018), *R.&R. adopted sub nom. by Leventhal v. Rios*, 2018 WL 3129004 (D. Minn. June 26, 2018) ("[B]ecause no final decision regarding his RRC placement has been made, any challenge regarding this matter is premature.").

No. 24 at 2.) Nowhere, however, does 18 U.S.C. § 3621 discuss sentence reduction for completion of a vocational training program. That statute instead permits a possible sentence reduction upon completion of a substance abuse treatment program, which is not at issue in this case. *See* 18 U.S.C. § 3621(e)(2)(B). Moreover, 34 U.S.C. § 60541 specifically provides that incentives for participating re-entry preparation programs cannot include a reduction of the term of imprisonment. *See* 34 U.S.C. § 60541(a)(2)(B).

Silva has also failed to explain how following the APA's notice and comment requirement and other rulemaking procedures will result in his earlier release. The mere fact that Silva seeks release or a reduced sentence as a remedy to the BOP's alleged transgressions does not convert his Petition into one challenging the fact or duration of his confinement. Indeed, "[t]here is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence."[3] *See Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 7 (1979).

In sum, while the placement in a halfway house or community confinement from prison results in a quantum change in the level of custody affording relief under § 2241, vocational opportunity and transfers between prisons do not regardless of whether §

---

[3] While Silva also makes a few passing references to 18 U.S.C. § 3553(a) in support of his Petition (*see e.g.,* Dkt. No. 2 at 1; Dkt. No. 18 at 1), § 3553(a) deals with the factors courts take into account with the initial imposition of a sentence, as opposed to the fact or duration of the resulting sentence, and thus does not apply to Silva's claims. *See* 18 U.S.C. § 3553(a) ("Factors to be considered in imposing a sentence.--The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider. . . .").

3621(b) is implicated.[4]  Silva's Petition and TRO Motion challenge the BOP's alleged failure to prepare him for release from prison and not the duration of his confinement. Instead, Silva's APA and constitutional claims touch upon the conditions of his confinement, and any such claims, including any claim for retaliation for filing grievances under the First Amendment or equal protection claim, should be brought under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).  *See Spencer*, 774 F.3d at 471.

---

[4]  This Court notes that the Eighth Circuit signaled that it may disagree with Respondent's argument (Dkt. No. 13 at 8-11) that the Court lacks jurisdiction under the APA to review its discretionary decisions relating to Silva.  *See Bohrn v. Marques*, 739 F. App'x 364 (8th Cir. 2018) (per curiam) ("Although the district court dismissed Bohrn's petition for lack of jurisdiction, it also adopted the magistrate judge's alternative recommendation that the petition should be denied on the merits. Construing Bohrn's petition as a challenge to the BOP's general policies regarding RRC placement, we agree with the district court's alternative disposition.").  Even assuming Silva's claims were appropriately brought under § 2241, his claims regarding placement are without merit. Neither § 3621 or § 60541 require the employment and vocational programs of Silva's choosing (regardless of whether he is part of any high-risk population) or require the BOP to promulgate any regulations.  Section 60541 only requires that the BOP assist Silva with his reentry.  By his own admission, Silva has been participating in several programs, including as a volunteer therapist helping inmates regain mobility and volunteering with hospice care.  (Dkt. No. 19; Dkt. No. 24 at 10-11.)  His work history also evidences participation in various vocational activities including, food service, vehicular component repair, computer repair and orderly.  (Dkt. No. 15-1.)  He has also failed to present any evidence that he was transferred between facilities in retaliation for grievances he filed against BOP officials.  In addition, Silva admittedly has no protected constitutional interest in vocational opportunities or protected interests in serving at any particular institution.  *See e.g., Moorman v. Thalacker*, 83 F.3d 970, 973 (8th Cir. 1996) ("Admittedly, his environment was disrupted by the transfer, but there is no liberty interest in assignment to any particular prison.") (citation omitted); *Wishon v. Gammon*, 978 F.2d 446, 450 (8th Cir. 1992) (inmates have no constitutional right to educational or vocational opportunities) (citation omitted); *Boulware v. Fed. Bureau of Prisons*, 518 F. Supp. 2d 186, 189 (D.D.C. 2007) ("[P]risoners do not have a due process right to participate in vocational and educational programs, let alone one of their choosing.") (citations omitted).

The Court should not automatically convert Silva's claims into a *Bivens* action without his consent and must instead give Silva the opportunity to do so. *Id.* However, Silva should be aware that this District has already concluded he meets the "three strikes" rule as laid out in the Prison Litigation Reform Act ("PLRA"), which would render him ineligible for in forma pauperis ("IFP") status in most cases. *See Silva v. United States*, No. 15-cv-3356 (ADM/TNL), Dkt. No. 6, (D. Minn. Oct. 29, 2015). The "three strikes" IFP rule provides:

> In no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under this section if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

28 U.S.C. § 1915(g). An inmate with "three strikes" is denied the benefits of the PLRA, including the ability to pay a filing fee in installments over time, unless the prisoner is under imminent danger of serious physical injury, which is not the case here. *Id.* As such, to the extent that Silva choses to proceed with a *Bivens* action,[5] he should be required to immediately pay the Clerk of Court $395, the amount remaining due on his filing fee (the $400 filing fee for civil cases, minus the $5 already paid by Silva (Dkt. No. 1)).

---

[5] The Court notes that the Supreme Court has never extended *Bivens* to a claim sounding in the First Amendment and has concluded that the expansion of the *Bivens* remedy is "disfavored." *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017); *Reichle v. Howards*, 566 U.S. 658, 663 (2012) (citations omitted).

## IV. ANALYSIS—TRO MOTION

Silva seeks injunctive relief in the form of the halting of all occupational programs not established as of October 1, 2018 until an adequate hearing can be set be set in order to seek out the adequate needs of the APA. (Dkt. No. 17; Dkt. No. 18 at 3-4.) Silva also claims he is challenging the execution of his sentence because the BOP has not properly prepared him for re-entry, as evidenced by the fact that he was not properly assessed when he was denied admission into the TAILS dog training program. (Dkt. No. 26 at 1, 3-5.) "[A]n injunction cannot issue if there is no chance of success on the merits." *Mid-Am. Real Estate Co. v. Iowa Realty Co.*, 406 F.3d 969, 972 (8th Cir. 2005) (citations omitted). Despite Silva's attempts to recharacterize his claims in order to avoid the $400 filing fee required in a civil rights action, because his claims deal with vocational programs he can participate in while incarcerated, they pertain to a condition of confinement that cannot be addressed as part of this habeas action. *See Spencer*, 774 F.3d at 469. Therefore, it is further recommended that Silva's TRO Motion be denied.

## V. RECOMMENDATION

Based on the foregoing, and on all of the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT**:

1. The petition for a writ of habeas corpus of Petitioner Natividad Silva (Dkt. No. 1) be **DENIED**.

2. Petitioner's Motion for a Temporary Restraining Order and Preliminary Injunction and Request or Emergency Hearing (Dkt. No. 17) be **DENIED**.

    3.    That this case be **DISMISSED** unless Petitioner pays $395 to the Clerk of Court for the District of Minnesota within fourteen (14) days after United States District Judge Eric Tostrud enters an order on this Report and Recommendation.

Dated: January 7, 2019

*s/ Elizabeth Cowan Wright*
ELIZABETH COWAN WRIGHT
United States Magistrate Judge

# NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  *See* Local Rule 72.2(b)(2).  All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).